## BABCOCK & WILCOX CO. v. SPRINGFIELD BOILER CO. et al.

(Circuit Court of Appeals, Second Circuit. January 10, 1927.)

### No. 102.

**1. Patents ⚌54—Prior patent, not solving problem, does not constitute anticipation.**

A prior patent, which does not solve the problem, does not constitute anticipation, as against subsequent successful patent.

**2. Patents ⚌54—Device requiring modification to accomplish object does not constitute anticipation.**

Though modification of a prior device which does not accomplish its object would make it do so, it does not constitute anticipation.

**3. Patents ⚌148—Infringer is not aided by narrowing of claims in reissue patent.**

Narrowing of claims in reissue patent does not aid infringer of claims as so narrowed.

**4. Patents ⚌328—1,141,520, claims 4, 6, 7, and 9, for superheater boiler, held not anticipated, and infringed.**

Bell patent, No. 1,141,520, claims 4, 6, 7, and 9, June 1, 1915, for superheater boiler, *held* not anticipated and infringed.

5. Patents ⨠328—15,210, reissue, claims 1, 2, 4, and 6, for superheater boiler, held not anticipated, and infringed.

Pratt reissue patent, No. 15,210, claims 1, 2, 4, and 6, October 18, 1921, for superheater boiler, *held* not anticipated, and infringed.

Appeal from the District Court of the United States for the Southern District of New York.

Suit for infringement of patents by the Babcock & Wilcox Company against the Springfield Boiler Company and another. From a decree for defendants (8 F.[2d] 618), plaintiff appeals. Reversed.

Gifford & Scull, of New York City (Livingston Gifford, of New York City, C. P. Byrnes, of Pittsburgh, Pa., and George F. Scull, of New York City, of counsel), for appellant.

John E. Hubbell, of New York City, for appellee Springfield Boiler Co.

Briesen & Schrenk, of New York City (John E. Hubbell, W. Brown Morton, and Fritz v. Briesen, all of New York City, of counsel), for appellee Superheater Co.

Before HOUGH, MANTON, and MACK, Circuit Judges.

MANTON, Circuit Judge. The appellant sues for infringement of claims 4, 6, 7, and 9 of the Bell patent, No. 1,141,520, granted June 1, 1915, and claims 1, 2, 4, and 6 of the reissue patent to Pratt, No. 15,210, granted October 18, 1921, which read as follows:

Bell Patent, No. 1,141,520.

"4. In a steam boiler, the combination, with longitudinally disposed upper and lower banks of tubes, of a transverse pass for the products of combustion having an upper restricted portion, and a superheater located in the lower larger portion of said pass."

"6. In a steam boiler, the combination, with longitudinally disposed upper and lower banks of tubes, of a transverse upward pass for the products of combustion, across the tubes having an upper restricted portion, a downward transverse pass across the tubes communicating with the upward pass and having a restricted lower portion, and a superheater located in the lower larger portion of the upward pass.

"7. In a horizontal water tube boiler, the combination, with upper and lower banks of water tubes, of a furnace located below the same, transversely disposed baffles to cause the products of combustion to flow upwardly across the tubes, and a superheater arranged in one of the passes formed by the baffles, said pass being constricted above the furnace."

"9. In a horizontal water tube boiler, the combination, with a substantially horizontal set of water tubes, of a furnace located below the same, oppositely extending transversely disposed baffles arranged across the tubes and producing up and down passes, one of said baffles having an offset to produce a constriction in the first pass and also in the second pass, and a superheater arranged in the first pass and above the furnace."

Pratt Reissue, No. 15,210.

"1. A water tube boiler having longitudinal water tubes, a superheater having transversely extending bent tubes between the water tubes, and baffling for directing the products of combustion, said baffling having a horizontally extending baffle above the lower water tubes to expose them to the flame and gases for the major portion of their length, and an upwardly projecting baffle extending therefrom transversely of the water tubes above the superheater, and arranged to give the gases a restricted upward transverse pass across the water tubes located above the superheater.

"2. A water tube boiler having front and rear water compartments connected by longitudinal horizontally extending water tubes, a superheater having transversely extending tubes between the water tubes, with bent portions within the setting, and baffling for directing the products of combustion, said baffling having a baffle extending in a horizontal direction along the lower rows of the water tubes located above the superheater, to expose the water tubes below the superheater to the flame and gases for the major portion of their length, and an upwardly projecting baffle extending therefrom transversely of the water tubes above the superheater, and arranged to give the gases a restricted upward transverse pass across the water tubes located above the superheater."

"4. A water tube boiler having water compartments connected by longitudinal horizontally extending water tubes, a superheater having transversely extending tubes between the rows of water tubes and provided with bent or curved portions, and baffling for directing the products of combustion, said baffling having a horizontally extending portion among the water tubes over the superheater, and also having a portion extending upwardly and transversely of the water tubes above the superheater, said baffling forming an upward transverse pass for the gases which is narrower among the water tubes

above the superheater than at the inlet to the water tubes below the superheater, the lowermost water tubes being exposed to the flame and gases for the major portion of their length."

"6. A water tube boiler having water compartments connected by longitudinal horizontally extending water tubes, a superheater having transversely extending tubes between the rows of water tubes and provided with bent. or curved portions within the setting, and baffling for directing the products of combustion, said baffling having a horizontally extending portion among the water tubes over the superheater, and also having a portion extending upwardly and transversely of the water tubes above the superheater, said baffling forming an upward transverse pass for the gases which is narrower among the water tubes above the superheater than at the inlet to the water tubes below the superheater and to the superheater, and another baffle depending among the upper water tubes and extending transversely of them arranged to give the gases another transverse down and up pass through said upper water tubes."

Both appellant and the Springfield Boiler Company, appellee, are manufacturers of boilers, and the Superheater Company, appellee, is a manufacturer of superheaters. The infringement relied upon occurred in the construction of the boiler at the Hell Gate station of the United Electric Light & Power Company of New York City. The user is not joined as a party. The court below held that the appellees did not infringe.

The boilers are used to furnish power to turbines for driving electric generators of central stations. Enormous power is required, involving the use of superheated steam at high temperature, which must be kept within a narrow range to avoid injuring the turbines. There are two classes of water tube boilers, vertical and horizontal. In the horizontal water tube boilers, the tubes are usually slightly inclined to the horizontal and extend into headers or water boxes at their ends, which water boxes are connected to an upper steam or water drum. In the upper steam or water drum, the water is maintained at a level intermediate the mouth of the drum. Steam is generated by heat applied to the water tubes, and the steam and water circulate through the tubes and pass up to the steam and water drum, where the same is liberated and is held under pressure in the steam space. The unvaporized water passes back into the circulation, together with the fresh water fed in, and

the steam is taken to the superheater. The superheater is a tubular structure, through which the steam passes from the steam and water drum; the superheater being also subjected to heat so as to raise the temperature of the steam and increase the efficiency of the engine or turbine which it drives. This created a demand for high and uniform superheat. With low superheat, the wet steam caused raindrops, which injured the turbine blades, and with too high superheat the high temperature would injure the plates. It was found in practice that the temperature should approach a red heat, and not rise too far or drop below this.

At the time Bell made his invention, the standard boiler used had a single bank of horizontally inclined water tubes extending between heaters connected to a steam and water drum, from which the steam passed into a superheater located above the bank of tubes and between this bank and the steam and water drum. It had a short furnace, extending only part of the length of the water tubes to a bridge wall. The gases were directed along the tubes by baffling, which was made of tiles extending transversely of the tubes, and caused the flame and gases to rise through the first pass, then down through the second pass, and thence up through the third and last pass. The superheater was in the triangular space above the water tubes and below the drums, so that the gases were cooled down very considerably by passing over the water tubes before they reached the superheater. Arrangement was made for flooding the superheater tubes with water to protect them against burning out, and various kinds of reflectory valves were used for shielding off part of the gases contacting with the superheater tubes. Thus care was used to prevent overheating of the superheated tubes. There were nine rows of water tubes, and the boilers were sometimes driven up to $1\frac{1}{2}$ or 2 times their rated capacity.

It was the peak loads, increased as the demand for electric power advanced, that caused engineers at this time to attempt to fill the demand for bigger and higher units and higher superheats. Bell designed a higher boiler with an unusual number of rows of water tubes, and increased correspondingly the amount of coal burned by adopting full fire in place of half firing. He relocated the superheater from its old position in the triangular space above the tubes down into the interdeck position between the banks, and thus attained compactness of the entire boiler and superheater

without increasing the size of the setting. Other efforts of patentees proposed doing away with all baffling, giving the flame and gases one pass over the bank of tubes and to place the superheater between some of the rows of tubes in the interdeck position. But the gases did not flow back over the water tubes and the superheater had to be either within the bank of water tubes or beyond it at the outlet flue.

This inventor conceived correctly that proper efficiency required the use of baffling. Single pass boilers did not become practical, nor were they used in this art. To obtain efficiency of his new boiler, this patentee adopted the transverse type of baffling extending across the tubes as in the standard boiler described. He extended the furnace to both ends. The flame and gases enter only the first pass, but when full-fired, with only cross-baffling, the flame and gases would rise through all passes and short-circuit to the outlet with low efficiency. To correct this, he used a longitudinal baffle—that is, longitudinal of the water tubes—and combined this with his transverse baffling to prevent the flames and gases entering all passes, and by this means constructed the angle baffle. The longitudinal or horizontal part of this baffle might be at any desirable level relative to the water tubes, either below all of them or above some of the lower rows of tubes. From its inner end rose the transverse or vertical part of this angle baffle. These two parts coacted to prevent short-circuiting to the second and third passes, and gave successive passes over different parts of the same water tubes.

But it was found that, in order to get sufficient space for the superheater, the upper part of the first pass of the gases was too large, for the superheater must be relatively larger to superheat the larger volume of steam generated in the high boiler. To use the superheater, the space for it must be long, along the water tubes, and, in order to generate steam effectively in the water tubes, the first pass must be smaller, in order to get good heat transmission. To accomplish this, the patentee enlarged the lower part of the first transverse path of the gases, which would give a longer space for the superheater, and then narrowed the flow space above the superheater over the water tubes. With this, he got the big superheater boiler with full firing, using a small floor space and compactness, due to interdeck placing of the superheater; he got plenty of space for the large superheater and crowded the gases into a narrow flow space

above the superheater, giving higher heating efficiency on the water tubes above. In this way he obtained substantially constant superheat at all ratings of the boiler.

This combination undoubtedly solved the problem of the high, big capacity superheated boiler in giving the advantages desired for high and constant superheat. This was made possible by enlarging the pass below, so that the superheater was located in the lower larger portion of the pass, and gave the proper amount of space for the superheater of the desired size for the big capacity boiler, and made possible the pocket and boiler compact. By contracting the upper part of the pass, he gave efficiency to the water tubes in that pass. The combination gave a flat superheat curve, and the boiler could be driven to many times its rated capacity and gave good over all efficiency. These advantages in the art were new, and no patent of the prior art anticipated them.

On November 28, 1916, the original patent, No. 1,206,246, was granted to Pratt, and the reissue, No. 15,210, was granted October 18, 1921. This is an improvement on the boiler we have been considering. It consists in taking the angle baffle referred to and moving it upward to a position above the superheater space. With this improvement the available space for the superheater was increased, even to the full length of the water tubes, with corresponding greater capacity. The superheater was extended under and along the longitudinal part of the angle baffle. It choked back the gases more effectively as they entered along the water tubes above the superheater, and gave better gas distribution over the superheater surface. It increased the effect of the radiant heat of the full length furnace upon the lower water tubes.

In July, 1920, the appellant became a bidder for its combination boiler of this Bell-Pratt type for the Hell Gate station of the United Electric Light & Power Company. In its bid, the appellant disclosed its boiler by its plans and specifications. The Springfield Boiler Company, in August, 1920, submitted its bid for the same work. By its drawings, it disclosed that the boiler it proposed putting in the work was of a different construction than that which it ultimately put in, having become the successful bidder. By its drawings, the superheater was to be placed in a dog house above all the tubes, and above the steam and water drum. It was 18 tubes high, with 3 banks; the lower bank being composed of 2 tubes, the intermediate of 6 tubes, and the upper bank of 10 tubes.

The steam and water drums were over the second transverse baffle, while the 2′ 9″ baffle for waste gases was at the right hand of the drum and over the right-hand headers. There was no interdeck superheater.

It is clear that the appellee, after this bidding, became acquainted with appellant's construction, for the boiler which it ultimately placed in the work is not the one disclosed by its drawings. It involves the idea and invention of the appellant's construction. As built, the boiler contained two separate banks of tubes, with 6 rows of tubes in the lower bank and 14 rows of tubes in the upper bank, making a 20 high boiler. The superheater was placed in the interdeck position between the banks. The superheater space was provided for; the steam and water drum was moved to a position directly over the rear heaters, in connecting it by vertical instead of inclined tubes. The waste gas outlet was changed to the left, between the steam and water drum and the second transverse baffle. The outlet was changed from a 2′ 9″ outlet to a 4′ 6″ gas outlet with damper controls. The steam and water drum was suspended by U-shaped overhead straps. The two rows of water circulating tubes, connecting the upper ends of the left-hand higher heaters to the steam and water drums, remained horizontal, instead of upwardly inclined, as in the Springfield Boiler Company's original dog house design. The dog house extension was omitted. The second transverse baffle was changed from the vertical baffle, extending from the center of the steam and water drum down to the intermediate bank of tubes, to a baffle bent to the left-hand end of the waste gas outlet, the baffle extending only part way down into the upper bank of tubes. The roof baffle portion of the first angle tube was moved upwardly above the lower of the two groups of tubes. In the dog house type, it was immediately above the second row, while in this boiler, it was above all of the 6 rows of tubes in the lower bank and above the superheater.

This boiler was a substantial copy of appellant's Bell-Pratt type, and of the blueprints which were submitted with their bid, except that a change was made in inserting the superheated tubes transversely of the water tubes, instead of lengthwise of the water tubes. The appellee's only change, therefore, was to insert the superheated tubes from the side, instead of the end, as in the tube constructed under the Bell patent. Figures 1 and 2 of the Bell patent show them inserted from the side, so that the appellees did, in point of fact, follow the drawings of the Bell patent. This copying of the appellant's design speaks eloquently of its novelty and its advance in the art. This boiler interdeck superheated tube answered the demands of the art in furnishing the constant superheat, and it has been a commercial success.

The advantages obtained by the appellant's boiler are found in appellees' construction. The first pass is enlarged below to receive the superheater, and is contracted above the superheater to give proper heating of the water tubes. They have two baffle constructions above the superheater, one caused by the longitudinal part of the angle baffle, and the other by inclining the vertical part of the angle baffle to further choke back the gases and distribute them evenly and uniformly over the superheater tubes. When the Pratt improvement is added to the Bell invention, the appellees' boiler is produced, for it contains Bell's basic new combination and Pratt's changes and improvements thereon. The one difference of an inclined vertical leg for the angle baffle used, instead of the stepped baffle, does not avoid infringement, and they must be regarded as equivalents.

The appellant has lengthened the second baffle, so as to get the best effect. Because the space for the superheater in the first pass is shortened, a corresponding portion of the superheated tubes is removed, and in the Pratt improvement the removed baffle, or horizontal part of the angle baffle, is raised to a position above the superheater. In doing this, the lower water tubes are exposed to the furnace for their greater length, and more space is produced for the superheater, which can be correspondingly lengthened. This change made in the Hell Gate boiler did not eliminate the Bell patent, because the position of the superheater in relation to the restricted part of the pass is the same in both, and in each case the lower part of the pass is enlarged to accommodate the superheater. Claims 4 and 6 of the Bell patent read directly on this.

But it is argued that the appellant does not have the pass referred to in claim 4 of the Bell patent. In his specifications, the patentee says that the object of his invention is to provide for the use of superheaters so arranged that the volume of hot gases from a furnace will come in full contact therewith after first passing over a number of heaters, and, after referring to the construction, he again refers to the second pass made by the set-off between the two upper sets of tubes, and says that by reason of the arrangement of his baffling, the first pass of the gases is

along the whole length of the lower tubes, and thence upwardly over the superheater and the rear end portion of the tubes *11* and *12*. The interchangeable use of the words "pass," "gas passage," and "passing of gases" in the specifications cannot be said to be used in any limited sense. The first pass, as that term is used, begins when the gases first contact with the heating surface, and the language of claim 4 establishes this beyond dispute.

The court below narrowly construed the meaning of the word "pass," because it was insisted by the appellant's expert that it meant only a portion of the boiler over which the gases flow, which was limited by baffling or by baffles and headers. The construction of the baffling, as in the appellant's boiler, makes for several passes for the gases and heat to flow, and undoubtedly, with full firing, the first pass begins when the gas contact with the tubes begins. We think this limitation placed upon the word "pass" referred to by the District Court cannot be sustained. It is clear that in appellees' construction the gases rise upwardly in a path or passage until they reach the top of the upper bank of water tubes. They then proceed through the second pass by reason of the arrangement of the angle baffles and into the third.

[1] It was thought below that the Sewell patent, No. 772,435, of the prior art, anticipated this patent and is a bar to the appellant's claims, although it was never found practical and, indeed, was a failure. The appellant was the owner of this patent and did construct a boiler pursuant to its teachings. They had every reason for making it a success, if it were possible. The inventor was in charge of the work of construction, and considerable money and time was expended in attempting to make it work successfully. An improvement was added in Sewell patent, No. 1,064,174, to remedy the defect in the syphoning, but the appellant dropped it because of its failure in overcoming the difficulties, due to their inability to control water levels, which resulted in water hammering. It was tried out with the best engineers of the day, and the struggle to make it a success is the best evidence of its impracticability and its inventive failure. Prior patents, none of which solved the problem, can have no effect in anticipating, qualifying, or defeating the claims for patent protection of those whose subsequent effort produced success. Consolidated Window Glass Co. v. Window Glass Machine Co. (C. C. A.) 261 F. 362.

[2] The learned court below pointed out that

certain changes in defects in the Sewell boiler might have won success. The defect was due to water circulation. The Sewell boiler showed three water levels, with the water feeder flowing from the one steam and water drum down to the next lower drum. It was this arrangement which caused the difficulty leading to its abandonment. The water levels could not be maintained in the drums at different levels. A device relied upon for anticipation is not sufficient, if it requires modifications to make it accomplish that which is to be performed by the patent in suit. It may not be redesigned, even by its maker, so as to make it adaptable for the performance of functions accomplished by the new invention. Topliff v. Topliff, 145 U. S. 161, 12 S. Ct. 825, 36 L. Ed. 658.

It is argued that the Bell patent is limited to the rebuilding of the boiler and obtaining uniform velocity of gas flow and that the appellees' boiler does not infringe for this reason. In all water tube boilers, the gases contract as they cool in imparting part of their heat to the tubes and the water or emulsion therein. The claims in suit should not be limited to a uniform velocity of the gases. The novelty of the invention here lay in the new combination of elements, each of which was old, by producing a new result and such a limitation would not make the claims more patentable.

There are other patents of the prior art referred to. Sewell was the nearest to the patent in suit. The others need not be considered, except to mention that the Jacobus patent, No. 1,470,744, was issued later than either of the patents in suit. Jacobus obtained a specific improvement patent, and refers to the meaning of a "pass." But it shows a vertical boiler, with longitudinal baffling back of the first bank; the gases, rising to the furnace, split and flow in opposite directions. It is not important. And the McPhail patent, No. 20,057 (British), shows a straight pass, and there is a lower larger portion for the superheater, and no restriction above the superheater. He put the superheater between groups of water tubes in a horizontal water tube boiler, and selected a boiler without baffles. He specifically advises using no baffles wherever the superheater is put in an interdeck position, and he also used 18 tubes below the superheater and fewer tubes above it. It does not anticipate. The prior art referred to in the anticipation of the Pratt reissue patent in no way supports the defense of anticipation.

Below it was claimed that the Pratt reissue recaptured claims canceled from an in-

termediate application of Pratt. Pratt's original application was filed October 8, 1915. On December 1, 1915, the Patent Office allowed him a claim which subsequently became the first claim of the original patent. On May 4th he accepted this broad claim, with others, and canceled the rejected claims. After this allowance, he filed an application, which showed three banks of water tubes, with a secondary combustive chamber between the lowermost set and the next set above. A superheater was shown in this secondary combustive chamber, and an angle þaffle was also shown. The feature of this patent lay in inserting the longitudinal U-shaped superheater tubes, with their legs embracing the nipples connecting the downtake headers of the groups. Claims allowed were canceled, and it was said below that in the reissue patent in suit Pratt attempted to recapture claims which were rejected upon his intermediate application; that is, the baffling arrangement disclosed by one of the rejected claims necessarily called for a reconstruction of the gas passage above the superheater. But the rejected and canceled claims are not the same claims as allowed in the Pratt reissue patent.

Of the three claims referred to below, claim 2 has no baffling of any kind, claim 3 is on the superheater, and claim 8 is limited to tubes being divided into three groups, and more specifically to a main bank of tubes, and a group intermediate the lowermost tubes and a main bank, and separated from both. None of these claims cover the combination of the claims in suit. Claim 2 was broader in omitting the baffle, claim 3 was broader in omitting the superheater, and claim 8 was much narrower, and covered nothing shown in the reissue patent. Therefore there was no recapture.

It is also argued that claim 1 of this patent covered a boiler with a superheater having transversely extended bent tubes between the water tubes, and with baffling having at least a part extending transversely of the water tubes. The patentable novelty lay, not in any one element, but in a combination of old elements. It did not lie in the bent tubes. These were to be found in the Bell patent in suit. Nor could it lie in the transversely extending bent tubes, for these were disclosed in the Bell patent. It lay in the new combination, not in one old element.

[3] It is clear from the proceedings in the Patent Office that the examiner did not allow claim 4 of the patent in suit because of any special meaning which was attached to the word "bent" in that claim. If the pat-

entee had broadened his claim after the appellees had spent time and money on the boiler, which did not infringe the claims of the original patent, then the appellees would make out a case of intervening rights. The patentee took his broader and valid claims, and narrowed them by adding further limiting clauses. When the appellees bid for the contract at Hell Gate, they were charged with the knowledge that they were copying a superheater boiler upon which there were two controlling patents. They took the risk, and were not helped by Pratt surrendering to narrowed claims. Specialty Machine Co. v. Ashcroft Mfg. Co. (C. C. A.) 213 F. 35; Motion Picture Co. v. Laemmle (D. C.) 214 F. 787; Ball & Roller Co. v. Sanford Mfg. Co. (C. C. A.) 297 F. 163.

[4, 5] The appellees' boiler, as constructed, reads upon each of the claims sued on—the Bell and Pratt patents. For the reasons we have stated, we think it infringes all the claims in suit.

The decree is reversed, with costs.